## UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Christopher McCummings, | ) | C/A No. 5:12-3315-TMC-KDW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| vs. | ) | REPORT AND RECOMMENDATION |
| | ) | |
| Carolyn W. Colvin, Acting Commissioner | ) | |
| of Social Security Administration,[1] | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Supplemental Security Benefits ("SSI"). For the reasons that follow, the undersigned recommends that the Commissioner's decision be affirmed.

## I.  Relevant Background

### A.  Procedural History

Plaintiff protectively filed his SSI application on July 17, 2009. Tr. 136. His application was denied initially and upon reconsideration. Tr. 65-68. At Plaintiff's request, an Administrative Law Judge ("ALJ") held a hearing on March 28, 2011, at which Plaintiff and a Vocational Expert ("VE") testified. Tr. 23-64. The ALJ issued an unfavorable decision on June 17, 2011, finding Plaintiff was not disabled. Tr. 10-21. The Appeals Council denied

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the court substitutes Carolyn W. Colvin for Michael J. Astrue as Defendant in this action.

Plaintiff's request for review of that decision, making it the final decision for purposes of judicial review. Tr.1-3. Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed on November 19, 2012. ECF No. 1.

### B. Plaintiff's Background and Medical History

Plaintiff completed high school taking special education classes. Tr. 30-31, 179-98. Plaintiff's prior employment included a few months of construction work laying pipe, one month working in a meat processing plant, carrying boxes in a tool company, and lawn maintenance work. Tr.139-45.

### 1. 2007

Social Security examiner, S. A. Wurster, Ph.D., conducted a Psychological Evaluation of Plaintiff on January 6, 2007. Tr. 203-05. Plaintiff's IQ test results of Full Scale IQ of 70 indicated "mental functioning in the low borderline range of intelligence." Tr. 204. Dr. Wurster noted that Plaintiff read at a second-grade level and performed arithmetic at a third-grade level. Tr. 205. Plaintiff noted that "he was unemployed, due in part, to living in a small town. His health is good and he is not taking any medication, though he's begun to have some arthritis in his back and hands." *Id.* Dr. Wurster opined that Plaintiff was mentally "capable of performing routine, unskilled work tasks such as landscaping or driving a forklift, and of concentrating at given tasks for two-hour periods of time." *Id.* He also opined that because of Plaintiff's limited literacy, Plaintiff would need help in managing his own funds. *Id.*

Susan J. Tankersley, M.D., examined Plaintiff on January 23, 2007. Tr. 206. Plaintiff complained of lower back pain of gradual onset that he believed might be associated with a motor vehicle accident five years prior. *Id.* Plaintiff also complained of waxing and waning

hand pain at the base of both thumbs that began a year ago, and intermittent ringing and decreased hearing in his left ear. Tr. 206-07. Plaintiff stated that he drank several beers per day. Tr. 207-08. Dr. Tankersley commented that Plaintiff's exam was "essentially unremarkable" and that he may have the onset of degenerative joint disease "but if so, pathology on physical exam at least, [was] minimal." Tr. 209. Dr. Tankersley suggested hand, lower back, and right hip films for documentation purposes. *Id.* A radiology report from McLeod Regional Medical Center, dated January 24, 2007, concluded Plaintiff had "mild scoliosis and very mild degenerative disc disease at L4/5." Tr. 210.

### 2. 2008

Harriett R. Steinert, M.D., conducted a Social Security Examination-Comprehensive Medical Exam of Plaintiff on July 15, 2008. Tr. 211-12. Plaintiff complained of pain in his lumbar spine for the past four years that "comes and goes." Tr. 211. Plaintiff noted that the pain was triggered by working in his yard and doing a lot of bending. *Id.* Plaintiff stated that he currently was not having any problems with his hands, but did complain of intermittent ringing in his left ear that occurred every other day. *Id.* Dr. Steinert diagnosed Plaintiff with arthritis of the neck and spine, and tinnitus. Tr. 212. Dr. Steinert found no limitations on Plaintiff's activities of daily living ("ADLs") or work activity. *Id.*

### 3. 2009

Plaintiff reported to the Marion County Medical Center Emergency Department on July 21, 2009, complaining of low back pain from cutting down a tree with an ax. Tr. 214. Plaintiff's spine was x-rayed and indicated the following: "There is degenerative disc disease present at L4/L5. The lumbar vertebrae are of normal height. Interspaces are otherwise well

maintained. The facet joints are normal." Tr. 226. Plaintiff was treated, and discharged with prescriptions for Flexeril 10 mg. and Ultram 50 mg. to take as needed for pain. Tr. 221.

Dr. Tankersley examined Plaintiff again on December 14, 2009. Tr. 232-35. Plaintiff complained of longstanding lower back pain that had worsened within the last year. Tr. 232. Plaintiff stated that the pain radiated to his right hip and occasionally down his right leg. *Id.* Plaintiff also stated that "his right arm began to bother him about one month ago." *Id.* Plaintiff stated that the pain began at the shoulder and radiated down his right arm; he also had some elbow pain. *Id.* Plaintiff stated that he drank a six-pack of beer a day. *Id.* Dr. Tankersley's impressions were: probable degenerative joint disease, degenerative disk disease of the lumbar spine, chronic lower back pain; possible onset degenerative joint disease of the shoulders; probable lateral epicondylitis right elbow; and possible alcohol abuse. Tr. 235. Dr. Tankersley suggested films of Plaintiff's lumbar spine, right shoulder, and possibly neck for documentation purposes. *Id.*

The December 15, 2009, diagnostic imaging report of Plaintiff's lumbar spine indicated "mild osteoarthritis at the lumbar spine with no acute body abnormality." Tr. 239. The imaging report of Plaintiff's cervical spine indicated "C5/6 degenerative disc disease. No acute body abnormality." Tr. 240.

### 4. 2010

On January 22, 2010, Samuel Goots, Ph.D., completed a Psychiatric Review Technique Form ("PRTF") for Plaintiff. Tr. 241-54. In the area of organic mental disorders, Dr. Goots noted a medically determinable impairment of "BIF [borderline intellectual functioning]." Tr. 242. In the area of personality disorders, Dr. Goots noted a medically determinable impairment of "PD, NOS [personality disorder, not otherwise specified]." Tr.

248. Under the "B" criteria of the Listings, in the area of functional limitation, Dr. Goots noted Plaintiff had mild degrees of limitation in the areas of restriction of ADLs, and in difficulties in maintaining social functioning. Tr. 251. Dr. Goots noted a moderate degree of limitation in the area of difficulties in maintaining concentration, persistence, or pace. *Id.* Dr. Goots noted no episodes of decompensation. *Id.* Dr. Goots found no evidence to establish the presence of the "C" criteria. Tr. 252. In his notes Dr. Goots concluded that Plaintiff's "primary barrier to employment appears to be his borderline intelligence. He is moderately limited but retains the capacity to do simple, unskilled work with ordinary supervision. He could avoid common, work-related dangers." Tr. 253.

Dr. Goots also completed a Mental Residual Functional Capacity ("RFC") Assessment of Plaintiff. Tr. 255-57. In the area of Understanding and Memory, Dr. Goots found Plaintiff was moderately limited in the ability to understand and remember detailed instructions, but otherwise was not significantly limited. Tr. 255. In the area of Sustained Concentration and Persistence, Dr. Goots found Plaintiff was moderately limited in the ability to carry out detailed instructions, but otherwise was not significantly limited. *Id.* Dr. Goots found Plaintiff had no significant limitations in the areas of Social Interaction or Adaptation. Tr. 256. Dr. Goots' conclusion was the same as in his PRTF. Tr. 257.

On February 9, 2010, medical consultant Richard Weymouth, M.D. completed a Physical RFC Assessment of Plaintiff. Tr. 259-66. Dr. Weymouth opined that Plaintiff could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk for six hours in an eight-hour workday with normal breaks, sit for about six hours in an eight-hour workday with normal breaks, and was unlimited in his ability to push and/or pull. Tr. 260. Dr. Weymouth noted no postural, manipulative, visual, communicative, or

environmental limitations. Tr. 261-63. With regard to the severity of Plaintiff's symptoms, Dr. Weymouth noted that Plaintiff's "allegations are partially credible in that there is decrease lumbar flexion but no other significant pathology[;] gait and grip are normal[,] as is muscle strength." Tr. 264.

On May 5, 2010, medical consultant Robert H. Heilpern, M.D. completed a Physical RFC Assessment of Plaintiff. Tr. 267-74. Dr. Heilpern opined that Plaintiff could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk for six hours in an eight-hour workday with normal breaks, sit for about six hours in an eight-hour workday with normal breaks, and was unlimited in his ability to push and/or pull. Tr. 268. Dr. Heilpern noted no postural, manipulative, visual, communicative, or environmental limitations. Tr. 269-71. In addition to the comments made by Dr. Weymouth regarding the severity of Plaintiff's symptoms, Dr. Heilpern adopted the prior decision and also noted that Plaintiff alleged "no new physical impairments. He states his conditions have not changed since last filing." Tr. 272.

On May 6, 2010, Samuel D. Williams, M.D. completed a PRTF of Plaintiff. Tr. 275-88. In the area of organic mental disorders, Dr. Williams noted a medically determinable impairment of "BIF [borderline intellectual functioning]." Tr. 276. In the area of personality disorders, Dr. Williams noted a medically determinable impairment of "personality DO, NOS [disorder, not otherwise specified]." Tr. 282. Under the "B" criteria of the Listings, in the area of functional limitation, Dr. Williams noted Plaintiff had mild degrees of limitation in the areas of restriction of ADLs, and in difficulties in maintaining social functioning. Tr. 285. Dr. Williams noted a moderate degree of limitation in the area of difficulties in maintaining concentration, persistence, or pace. *Id.* Dr. Williams noted no episodes of decompensation.

*Id.* Dr. Williams found no evidence to establish the presence of the "C" criteria. Tr. 286. Dr. Williams adopted the prior decision and concluded that Plaintiff alleged no new allegations and stated his conditions had not changed since his last filing. Tr. 287. Plaintiff had no new mental allegation. *Id.*

Dr. Williams also completed a Mental RFC Assessment of Plaintiff. Tr. 289-92. In the area of Understanding and Memory, Dr. Williams found Plaintiff moderately limited in the ability to understand and remember detailed instructions, but otherwise was not significantly limited. Tr. 289. In the area of Sustained Concentration and Persistence, Dr. Williams found Plaintiff moderately limited in the ability to carry out detailed instructions, but otherwise was not significantly limited. *Id.* Dr. Williams found Plaintiff had no significant limitations in the areas of Social Interaction or Adaptation. Tr. 290.

5.  2011

Dan H. Allen, Ph.D., completed an Intellectual Assessment of Plaintiff on April 28, 2011.[2] Tr. 293-95. Plaintiff stated that for a number of years he drank "two beers a day." Tr. 294. Dr. Allen's assessment results and "Full Scale Score of 59" placed Plaintiff in the "moderately to mildly deficient range of intellectual functioning." *Id.* Dr. Allen found Plaintiff could read on a grade level of 1.4, spell on a grade level of 2.1, and comprehend math on a grade level of 2.2. Tr. 295. Plaintiff stated that when he obtained his driver's license he had to go a number of times and the questions had to be read to him. *Id.* Dr. Allen opined that Plaintiff "would have much difficulty in transferring learning from one situation to another, and even with one-step tasks, his productivity would be slow." *Id.*

_____

[2] This assessment was completed after Plaintiff's administrative hearing of March 28, 2011.

### C.  The Administrative Hearing

#### 1.  Plaintiff's Testimony

A hearing was held on March 28, 2011, at which Plaintiff and VE Dixon Pearsall testified. Tr. 22-64. Plaintiff testified that he was 48 years old, and lived with his 60-year-old brother. Tr. 29.  Plaintiff graduated with a high school diploma but was enrolled in special education classes. Tr. 30-31. Plaintiff testified that he did not "know how to read or write that good." Tr. 32. Plaintiff testified that he had a driver's license, but let it expire in 2000 because he did not have transportation. Tr. 33-34. Plaintiff stated that when he took his driver's test, he took the written test on the computer. Tr. 34. Plaintiff testified that he goes to the grocery store, and he goes to the mall to "just look around." Tr. 36.  Plaintiff stated that he also goes to church. *Id.* Plaintiff testified that he was able to take care of his personal hygiene, but that his brother, who is retired, did all of the cooking. Tr. 36-37. Plaintiff stated that he could make a sandwich or heat something in the microwave. Tr. 37. Plaintiff also testified that he did household chores such as laundry, mopping, sweeping, vacuuming, washing dishes by hand, taking out the trash, cleaning the bathroom, folding clothes, and yard work. Tr. 38-39.

Plaintiff testified that he last worked in 2006 at Smithfield, a meat packing company, where his job duty was to cut meat. Tr. 39. Plaintiff testified that he worked there about three months and quit because his back was giving him problems. *Id.* Before working at Smithfield, Plaintiff testified that he was employed through temporary staffing agencies and worked at W Underground laying pipe, and at Harbor Freight. Tr. 41. Plaintiff testified that these jobs required a lot of heavy lifting and placed too much of a strain on his back. Tr. 47. Plaintiff had not worked since filing his disability claim. Tr. 41.

Plaintiff testified that he did not have a family doctor or insurance and, although he back was hurting, he had not been to the doctor in the last few months and could not remember the last time he went to a doctor, other than Social Security doctors. Tr. 42. Plaintiff testified that he did not have a problem with his hearing, or with his neck, but that he did have pain in his lower back, left leg, and foot. Tr. 47-48. Plaintiff stated that if the pain was bad he took Tylenol or a BC,[3] but he did not have any prescription medications. Tr. 48-49.

Plaintiff testified that on a typical day he would get up around 8:00 a.m., eat breakfast prepared by his brother, wash the dishes, and then ride his bicycle around town until time to return home for lunch. Tr. 44-45. After lunch Plaintiff stated that he would lie down and watch television. Tr. 46. When asked by his attorney if he considered trying to find another job, Plaintiff replied that if he tries to find another job, "they're not hiring." *Id.* Plaintiff testified that he drinks "a six-pack a day" of beer on most days and has been drinking that amount since he was 17-years-old. Tr. 51.

Plaintiff stated that he would probably be able to sit or stand for 30 minutes to an hour before his lower back would start hurting. Tr. 56. Plaintiff stated that he could probably walk a mile or two in 30 minutes to an hour, and ride a bike for one or two hours. Tr. 57. Plaintiff testified that the heaviest weight he could pick up was probably 50 pounds. *Id.* He stated that no doctors had ever told him not to do specific things. *Id.*

---

[3] BC Powder contains aspirin and caffeine and is indicated for the relief of simple headache, for temporary relief of minor arthritic pain, muscular aches, discomfort and fever of colds, normal menstrual pain, and pain of tooth extraction. *See* http://www.drugs.com/drp/bc-powder.html (last visited Oct. 18, 2013).

## 2. VE Testimony

The VE testified that Plaintiff did not have past relevant work ("PRW") at the "SGA [substantial gainful activity]" level. Tr. 59. The ALJ asked the VE to identify jobs that could be performed by a hypothetical individual of the approximate age, education, and past work experience as Plaintiff who could perform only simple, routine, and repetitive tasks that did not require lifting or carrying over 50 pounds occasionally or 25 pounds frequently. Tr. 59-60. The VE stated that such an individual could perform 85-90 percent of the full range of medium work and identified the following positions: hand packer or packager, DOT code 920.587-018, medium, SVP of 2, with 9,000 positions in the South Carolina economy and excess of 900,000 in the U.S. economy; and kitchen hand or kitchen helper, DOT code 318.687-010, medium, SVP of 2, with 14,000 positions in the South Carolina economy and excess of 1 million in the U.S. economy. Tr. 60-61. The ALJ asked what would be the impact on the ability to perform those jobs for an individual who read at the second-grade level and had math skills at the third grade level, and the VE opined "it would not significantly impact any of those jobs." Tr. 61.

The ALJ posed a second hypothetical with an individual of a the same age, education, and past work experience as Plaintiff who is limited to "performing simple, routine, and repetitive tasks; who does not require lifting and carrying over 20 pounds occasionally, 10 pounds frequently; no more than frequent stooping, twisting, crouching, kneeling, climbing of stairs or ramps, or balancing; no more than occasional crawling or climbing of ladders, ropes, or scaffolds; and no reading or writing above the second grade level or math above the third grade level." *Id.* The VE identified the position of housekeeper, DOT code 322.687.-014, light, SVP of 2, with 8,000 positions in the South Carolina economy and excess of

750,000 positions in the U.S. economy; and cafeteria worker, DOT code 311.677-010, light, SVP of 2, with 3,500 positions in the South Carolina economy and excess of 400,000 positions in the U.S. economy. Tr. 62. The VE noted that all of the jobs he identified for both hypotheticals were unskilled. *Id.*

## II. Discussion

### A. The ALJ's Findings

In his June 17, 2011 decision, the ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since July 17, 2009, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: degenerative disc disease of the cervical spine, osteoarthritis, degenerative joint disease of the lumbar spine, borderline intellectual functioning, dependent personality disorder, and reading disorder (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), r16.925 and 416.926).

4. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a range of light work as defined in 20 CFR 416.967(b) in that he can lift and carry up to twenty pounds occasionally and ten pounds frequently; stand and walk for about six hours in a workday; and sit throughout the workday. He can frequently stoop, twist, crouch, kneel, balance, and climb ramps and stairs but only occasionally crawl or climb ladders, ropes, and scaffolds. By reason of his mental impairments, he is further restricted to simple, routine tasks requiring no reading above the second grade level and no mathematics above the third grade level.

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was born on August 30, 1962 and was 46 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. The claimant has a high school education and is able to communicate in English (20 CFR 416.964).

8.  Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since July 17, 2009, the date the application was filed (20 CFR 416.920(g)).

Tr. 12-20.

    B.  Legal Framework

        1.      The Commissioner's Determination-of-Disability Process

The Act provides that, for eligible individuals age 18 or older, benefits shall be available to those who are "under a disability," defined as one who is:

> unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.

42 U.S.C. § 1382c(a)(3)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[4] (4) whether such impairment prevents claimant from

_____

[4] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether

performing PRW; and (5) whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. § 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is

---

there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen v. Yuckert*, 482 U.S. at 146. n.5 (regarding burdens of proof).

          2.      The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g); *see* 42 U.S.C. § 1383(c)(3) (applying § 405(g) judicial review provisions to SSI matters). The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 428 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Perales*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational. *See Vitek*, 428 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

C.  Analysis

Plaintiff asserts that the "ALJ's determination that the Plaintiff did not meet listing 12.05C is based on legal error and is not supported by substantial evidence[,]" and (2) the "ALJ fails to properly explain his decision to assign little weight to Dr. Allen's opinion." Pl.'s Br. 14 and 24, ECF No. 20. The Commissioner argues that substantial evidence supports the ALJ's finding regarding listing 12.05, and the ALJ properly evaluated Dr. Allen's exam report.

1.  Listing 12.05C

Plaintiff argues that the ALJ erred in finding that Plaintiff did not meet Listing 12.05C. The introduction to Section 12.00 of the Listings clarifies how the structure for 12.05 differs from other mental disorder listings. "Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(A). Listing 12.05 refers to mental retardation and states:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied. . . .
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05.

Citing to the definition for mental retardation in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (Revised) (DSM-IV-R) that requires "significant limitations in adaptive functioning in at least two . . . skill areas[,]" the ALJ found that the evidence in this case supported "a significant deficit in [Plaintiff's] functional academic skills" but no "significant deficits in any of the other skill areas described in the DSM-IV-R." Tr. 13. In making this finding the ALJ noted the evidence, including Plaintiff's regular activities, living and social situation, educational history, and medical information. *Id.* The ALJ concluded that Plaintiff did "not meet or equal the requirements of Section 12.05 of the Listing of Impairments, and his borderline intellectual functioning will be considered under Section 12.02 of the Listing of Impairments." Tr. 13.

Plaintiff asserts that it is "undisputed that [Plaintiff] has additional severe impairments apart from his intellectual functioning" and therefore the only issue is whether he "has an IQ score of 70 or below and whether this condition was evidenced prior to age 22." Pl.'s Br. 15. Plaintiff argues that because the ALJ is not qualified "to dismiss uncontradicted IQ results," the ALJ's analysis in dismissing Plaintiff's IQ scores "constitutes legal error." Pl.'s Br. 17. Plaintiff asserts that the language in Listing 12.05 requires that a claimant establish functional deficits that existed prior to age 22, it does not require significant or severe deficits, and it is not an "additional affirmative requirement on the claimant." Pl.'s Br. 18.

The Commissioner argues that Plaintiff's focus on IQ scores is not a sufficient basis for showing that he met Listing 12.05. Def.'s Br. 20. Citing to *Hancock v. Astrue*, 667 F.3d 470 (4th Cir. 2012), the Commissioner asserts that in addition to the IQ score, "Plaintiff must also show significant deficits in adaptive functioning stemming from his intellectual

impairment." Def.'s Br. 18. In *Hancock*, the Fourth Circuit held that the first prong of Listing 12.05 analysis "requires a showing of 'deficits in adaptive functioning initially manifested during the developmental period.'" *Hancock*, 667 F.3d at 473. The second prong "requires the satisfaction of one of four additional requirements." *Id.* The court held that "even if the ALJ's finding concerning Prong 2 of Listing 12.05C did not rest on substantial evidence, we would still be required to affirm the ALJ's decision if his finding with regard to Prong 1 was based on substantial evidence." *Id.* at 475. The Commissioner asserts substantial evidence supports the ALJ's finding that Plaintiff does not meet Listing 12.05 because he fails to meet the first prong. Def.'s Br. 20-21.

In determining whether Plaintiff had deficits in adaptive functioning, the ALJ cited to Plaintiff's ability to perform "a significant pattern of regular household activities on his own," the fact that Plaintiff "obtained a driver's license by passing a written test on the computer," and the examiner's description of Plaintiff's condition as "low borderline intellectual functioning, not mental retardation." Tr. 13. The ALJ also noted Plaintiff's testimony about his ADLs. *Id.* The ALJ did not "dismiss" Plaintiff's IQ scores as Plaintiff claims. The ALJ noted Dr. Wurster's full scale test score of 70 in making his decision. Tr. 13. The ALJ also discussed the report and IQ score provided by Dr. Allen after the hearing, and gave Dr. Allen's conclusions less weight. Tr. 18. "This circuit permits an ALJ to weigh conflicting IQ test results . . . ." *Hancock v. Astrue*, 667 F.3d 470, 474 (4th Cir. 2012). Furthermore, "an ALJ has the discretion to assess the validity of an IQ test result and is not required to accept it even if it is the only such result in the record." *Id.* As noted in *Hancock*, Plaintiff can prevail only if he can establish "that the ALJ erred in his analysis of Prong 1 and Prong 2." *Id.* at 475. Therefore, even if the ALJ had erred by "dismissing" Plaintiff's IQ

scores, if the ALJ's finding regarding Plaintiff's adaptive deficits, Prong 1, was based on substantial evidence, his decision would have to be affirmed. The undersigned finds that the ALJ's rationale for finding the Plaintiff does not meet the listing for mental retardation based on lack of significant limitations in adaptive functioning is supported by substantial evidence.

2.    Dr. Allen's Opinion

Plaintiff asserts that the ALJ failed to properly explain his decision to assign little weight to the opinion of Dr. Allen. Pl.'s Br. 24. Specifically, Plaintiff argues that the ALJ's noting discrepancies between Plaintiff's hearing testimony and Dr. Allen's report "is not a valid reason to dismiss the weight of the opinion." Pl.'s Br. 26. Plaintiff also argues the ALJ erred in giving Dr. Allen's opinion limited weight based on the difference in IQ scores between Dr. Allen and Dr. Wurster, based on the fact that the evaluation was purchased by Plaintiff's representative, and based on Plaintiff's appearance and testimony at the hearing. Pl.'s Br. 27. The Commissioner asserts there is substantial evidence to support the ALJ's decision to discount Dr. Allen's opinion including Plaintiff's inconsistent self-reports, inconsistent IQ scores, and the fact that it was an advocacy opinion. Def.'s Br. 13-16.  The ALJ's cited reasons for why he gave limited weight to Dr. Allen's "post-hearing psychological evaluation" include the following:

> First, I note several discrepancies in the report from the claimant's sworn testimony at the hearing. For example, the claimant appears to have minimized his consumption of alcohol during the evaluation, reporting to Dr. Allen that "about all I have is two beers a day." (Dr. Allen's report indicates he quoted the claimant's statement verbatim.) That is significantly different from his testimony at the hearing that he consumes a six pack of beer just about every day, and has never availed himself of rehabilitation or AA. As another specific example, Dr. Allen noted the claimant's report that when he obtained his driver's license, he "had to go a whole lot of times to get it, and they had to read the questions to me." Again, that is materially different from his sworn testimony at the hearing, when he testified he took a written test on the computer. As yet another example, the claimant told Dr. Allen he pretty

much just stays "around the house to be with (his) brother" and said "his brother does the cooking and cleaning." Once again, this contrasts sharply with the claimant's testimony at the hearing, when he said that in addition to being fully independent in his bathing, dressing and personal care, he heats food in the microwave, makes sandwiches, shops a little for groceries, washes his clothes, mops, sweeps or vacuums the floors, helps wash and dry the dishes, takes out the trash, cleans the sink, toilet and tub in the bathroom, folds his clothes and helps with the yard work. This apparent revision of history can reasonably be interpreted as an effort to minimize his abilities and make himself appear more impaired than he actually is.

Of greater import, however, is the difference between the IQ scores determined by Dr. Allen when compared to the IQ scores from Dr. Wurster's assessment discussed in the previous paragraph. All scores obtained in Dr. Wurster's testing were significantly higher, by some 7 to 11 IQ points, than those reported by Dr. Allen. Dr. Allen's evaluation was purchased by the claimant's representative for the purpose of supporting this claim for disability, not as part of a comprehensive psychological treatment regimen. The combination of these factors causes me to give less weight to his conclusions and the IQ scores he reported than to the other evidence of record, specifically including the report of Dr. Wurster and the claimant's appearance and testimony at the hearing. Finally, I note that the claimant's self-serving reports to Dr. Allen addressed in this paragraph significantly and negatively impact his overall personal credibility.

Tr. 17-18.

The ALJ is obligated to evaluate and weigh medical opinions "pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson v. Barnhart*, 434 F.3d at 654 (citing 20 C.F.R. § 404.1527). However, the weight to be accorded to a medical opinion is in the discretion of the ALJ, as long as his findings are supported by substantial evidence. *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).

The ALJ reviewed the record evidence and found the opinions of Dr. Allen inconsistent with the record as a whole. The ALJ appropriately performed this review,

considering Plaintiff's testimony and credibility, as well as the report of another consulting examiner. The fact that the ALJ noted that Dr. Allen's opinion was "purchased by the claimant's representative for the purpose of supporting this claim for disability, not as part of a comprehensive psychological treatment regimen" is not in and of itself error. "The court does not foreclose the possibility that whether a medical opinion is procured by attorney referral may sometimes be a factor in the weight given to that opinion; however, that fact alone is insufficient to establish substantial evidence for discounting the [ ] opinion . . . ." *Jordan v. Colvin*, No. 8:12-cv-01676-DCN, 2013 WL 5317334, at *7 (D.S.C. Sept. 20, 2013) (citing *Hinton v. Massanari*, 13 F. App'x 819, 824 (10th Cir. 2001) (holding that an ALJ may "question a doctor's credibility" when the opinion was solicited by counsel but "may not automatically reject the opinion for that reason alone")). Here, the ALJ specifically stated that the "combination of these factors" caused him to give less weight to Dr. Allen's conclusions and IQ scores, he did not discount the opinion simply because it was solicited by Plaintiff's counsel. Tr. 18. Accordingly, the undersigned finds that there is substantial evidence to support the ALJ's decision to give less weight to the report of Dr. Allen.

III.     Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court finds that the Commissioner performed an adequate review of the whole record, including evidence regarding Plaintiff's conditions, and the decision is supported by substantial evidence.

Accordingly, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions

under Section 205(g), sentence four, and Section 1631(c)(3) of the Act, 42 U.S.C. Sections

405(g) and 1383(c)(3), it is recommended that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.


October 24, 2013                                         Kaymani D. West
Florence, South Carolina                          United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**